PETER F. MARING AND BETTIE L. MARING, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Maring v. Commissioner
Docket Nos. 26302-83; 2662-84; 29168-85; 29354-85; 29731-85; 29873-85; 29878-85
United States Tax Court
T.C. Memo 1988-469; 1988 Tax Ct. Memo LEXIS 494; 56 T.C.M. (CCH) 343; T.C.M. (RIA) 88469; September 27, 1988. Russell A. Sandor and Joseph Wetzel, for the petitioners. Albert A. Balboni and Jeffrey N. Kelm, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax for the years and in the amounts as follows: Addition to tax
Docket No.
Petitioners
Taxable Year
Deficiency
Sec. 6653(a) [2]
26302-83
Peter F. Maring
1979
$  18,759
29878-85
and Bettie L. Maring
1980
16,925
1981
12,423
2662-84
Lawrence J. Franks
1978
122,420
and Jonelle Franks
1979
142,785
29168-85
Robert H. Blomquist
1979
14,156
and Karen I. Blomquist
1980
57,603
1981
68,435
29354-85
Thomas H. McAllister
1978
18,709
$   935
and Veda J. McAllister
1979
59,696
2,985
1980
152,176
1981
151,205
29731-85
John S. Maring, Laura
1976
11,049
J. Maring, and Rosemary
1977
62,416
E. Lindquist (formerly
1978
351,071
Rosemary E. Maring)
1979
1,946,772
29873-85
David C. Castagno and
1978
7,426
Darla J. Castagno
1979
29,795
1980
40,293
1981
63,002
*499 In his Amended Answer with respect to Thomas H. and Veda J. McAllister, respondent asserted the addition to tax for negligence under section 6653(a) for 1980 and under section 6653(a)(1) and (a)(2) for 1981. Additionally, in his Amended Answers, respondent alleged that the remaining petitioners were liable for the addition to tax for negligence under section 6653(a) for the years 1976 through 1980 and section 6653(a)(1) and (a)(2) for the year 1981. In his Amended Answers, respondent alleged that the deficiencies owed by each of the petitioners constitute substantial underpayments attributable to tax motivated transactions within the meaning of section 6621(c). [3]
At the end of the trial, *500 respondent orally moved the Court to award damages under section 6673 with respect to each petitioner. The Court took respondent's motion under advisement. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision the following: (1) whether petitioners are entitled to deduct losses with respect to alleged Government securities transactions; (2) whether petitioners' purported gain and income with respect to Government securities transactions are includable in income; (3) whether petitioners are entitled to deduct interest expense with respect to their alleged Government securities transactions under section 163; (4) whether petitioners are entitled to deduct fees allegedly paid with respect to their purported Government securities transactions under section 212; (5) whether petitioners are liable for the addition to tax under the provisions of section 6653(a) for the years 1976 through 1980 and section 6653(a)(1) and (a)(2) for the year 1981; (6) whether petitioners' deficiencies constitute substantial underpayments attributable to tax-motivated transactions within the meaning of section 6621(c); and (7) whether damages should *501 be awarded to the United States under section 6673. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. [4]
Peter F. and Bettie L. Maring resided in Portland, Oregon, at the time their petitions with this Court were filed. They filed joint Federal income tax returns for the tax years 1979, 1980, and 1981. Peter Maring sold surveying instruments and mutual funds during the years in issue. Lawrence J. Franks resided in Gresham, Oregon, and Jonelle Franks lived in Eugene, Oregon, when their petition was filed. They filed joint Federal income tax returns for the years 1978 and 1979. Dr. Franks is a neurosurgeon. Robert H. and Karen I. Blomquist resided in Portland, Oregon, at the time their petition was filed. They filed joint Federal income tax returns for the tax years 1979, 1980, and 1981. Dr. Blomquist *502 is a physician specializing in internal medicine. Mrs. Blomquist obtained her real estate license in the mid-1970s. She enrolled in business courses in 1977 and received a MBA in 1980. Thomas H. and Veda J. McAllister resided in Woodburn, Oregon, at the time their petition was filed. They filed joint Federal income tax returns for the years 1978, 1979, 1980, and 1981. Dr. McAllister is a dentist. John S. and Laura J. Maring resided in Portland, Oregon, at the time their petition was filed. They filed joint Federal income tax returns for the years 1977, 1978, and 1979. Rosemary E. Lindquist, formerly Rosemary E. Maring, resided in Portland, Oregon, at the time her petition was filed. She and John Maring filed a joint Federal income tax return for the year 1976. [5]
David C. and Darla J. Castagno resided in Beaverton, Oregon, at the time their petition was filed. They *503 filed joint Federal income tax returns for the years 1978, 1979, 1980, and 1981. Mr. Castagno was licensed by the National Association of Securities Dealers, Inc. (NASD) in 1965. John Maring is a real estate broker with Maring & Associates. He was the sole proprietor of diversified Capital, Inc., a general contracting company, from 1976 through 1981. He received his license with the NASD in 1971 or 1972, and he maintained his license through 1986. In the mid-1970s, John Maring syndicated several real estate partnerships. In 1976 and 1977, he formed four oil and gas partnerships. Upon receiving his real estate license in 1974 or 1975, Mr. Castagno became a salesman for John Maring's company. During the years in issue, petitioners entered into alleged government securities transactions through various entities that were controlled by Michael M. Senft. Petitioners allegedly invested in Treasury bills as clients of entities that were controlled by Mr. Senft, as limited partners of a partnership that was a client of Mr. Senft's entities, and as general partners of partnerships that were limited partners of Mr. Senft's entities.
Michael M. Senft & Co.
In 1975 or 1976 *504 Mr. Senft formed Michael M. Senft & Co. (Senft & Co.), a partnership, as an investment advisory firm in Chicago, Illinois. Mr. Senft established Senft & Co. to act as a middleman between individuals who needed tax benefits and brokerage firms that would provide the losses. Mr. Senft used an alleged trading program entitled "bond borrow versus collateral pledged." In September 1978, Senft & Co. issued a "Description of Bond Investment Program," which stated, in part, as follows: Under the Program, an investor will attempt to earn long-term capital gains by investing in U.S. Government and/or highest quality Corporate Bonds. The Advisor will attempt to purchase Bonds for the investor which he believes will appreciate in value and will generate capital gains and interest income over a period of at least one year, which will exceed the net interest cost of carrying the Bonds. The Program will use leverage to the full extent practicable; * * *
* * * The margin maintenance requirements for the Bonds is currently one-half of the initial margin requirement. As the market price of the Bonds goes up, equity can be released from the account by the carrying broker. However, if the *505 market price of the Bonds were to drop below one-half of their initial cost, additional collateral would have to be deposited by the investor, or some or all of the Bonds would be sold to meet the margin call. The document described the tax benefits purportedly to be realized from the program. Mr. Senft, the principal of Senft & Co., was granted full discretion by his clients to trade their accounts with Senft & Co. Senft & Co. used client agreements that read, in part, as follows: 1. The Client retains the Investment Manager [Mr. Senft] to manage, invest and reinvest in Treasury Bills and Treasury Bill Futures for the account of the Client, and to sell, redeem or otherwise dispose of the same for the benefit of the client, and in connection therewith appoints the Investment Manager as Client's agent and attorney-in-fact and grants the Investment Manager full authority to make all decisions and to give all orders and instructions for the purposes of this Agreement without prior consultation with the client. 2. Investment Manager will have discretion with respect to choice of brokers and dealers to execute transactions for the account of the Client. * * * 12. The *506 client states that he has read the offering memorandum and opinion of counsel describing the "Program" and has consulted with his tax advisor * * *. Beech Run, Ltd. (Beech Run), a partnership of which John Maring, Dr. Franks and Mr. Castagno were limited partners as a client of Senft & Co. entered into a client agreement with Senft & Co. Beech run was a limited partnership of which Mr. Delbert K. Burkhart was the sole general partner. It was formed to enter into mining operations for profit which it would offset by losses on purported Treasury bill transactions. Prior to the formation of Beech run, Mr. Burkhart met with Mr. Senft and arranged for Beech Run, if formed, to enter into a purported Treasury bill program through Mr. Senft. Mr. Burkhart was informed by Mr. Senft that the Treasury bill program was designed to generate ordinary losses in one year offset by equal gains in the next year. Mr. Burkhart was told that the "margin deposit" to be paid by Beech Run was to be a percentage of the tax loss desired. He was also informed that the program would be designed to generate no actual profit or loss so that the only payment required would be the "margin deposit" and that *507 no economic gain would result from the transaction. In November 1977 Beech Run paid ACLI Government Securities, Inc. (ACLI), a "margin deposit" of $ 102,400 for a purported loss of $ 1,280,000. In 1978 Beech Run paid ACLI a "margin deposit" of $ 46,000 and requested a loss of $ 1,150,000. In 1979 Beech Run paid a "margin deposit" to Sentinel financial Instruments (SFI) in the total amount of $ 94,319 and requested losses of $ 1,268,650. The 1977, 1978, and 1979 transactions were arranged in a manner to preclude the making of a profit. Senft & Co. had statements sent to its clients indicating that their accounts were brokered through ACLI of Chicago, Illinois, a primary dealer in government securities. Clients of Senft & Co. entered into customer agreements with ACLI that provided, in part, as follows: all transactions executed by you [ACLI] for the account of the customer * * * for the purchase or sale of government securities and other financial instruments, whether for immediate delivery or for delivery under the terms of futures or forward contracts or subject to a standby or option contract, shall be subject to the following terms and conditions: 1. All transactions *508 shall be subject to the constitution, rules regulations, customs, usages, rulings and interpretations, then obtaining, of the exchange or market and its clearing house, if any, where the transactions are executed by you [ACLI] or your [ACLI's] agents. All transactions under this agreement shall also be subject to any law, rule, or regulation then applicable thereto. Orders are to be received and executed with the understanding that actual delivery is contemplated. With respect to futures transactions, it is expressly understood that unless otherwise disclosed to the customer in writing in your [ACLI's] normal manner, you [ACLI] are acting solely as a broker as to any transactions made with you [ACLI] by the customer. * * * Mr. Senft allegedly chose the securities and prices of the securities that were allegedly bought and sold by ACLI on behalf of clients of Senft & Co. Mr. Senft at times requested ACLI to buy and sell securities for Senft & Co. clients, but he has not actual knowledge that ACLI did so. Mr. Senft prepared a sheet summarizing the accounts of Senft & Co.'s clients who allegedly traded through ACLI in 1978. The sheet lists the client's name and account *509 number, the alleged margin deposit, loss goal, alleged loss realized, Senft & Co.'s fee, ACLI's fee, and fees paid to salesmen for referring clients. The alleged "margin deposit" represented a percentage of the tax loss that the client wanted to realize. Each Senft & Co. client paid his alleged margin deposit to ACLI. ACLI kept a portion of the margin deposit as its fee and paid a portion to Senft & Co. as its advisory fee. Senft & Co. kept part of the advisory fee, paid part to its salesmen, and returned part to its clients. The clients of Senft & Co. were informed that the losses and gains to be realized from the alleged trading in government securities would offset each other so that the only funds they would be required to pay was the alleged "margin deposit" and the only amount they would receive from the transaction would be a return of a portion of that alleged deposit. The ACLI accounts of Senft & Co. clients generally showed a net loss at the end of a trading program because Senft & Co.'s fee was paid out of the client's margin deposit. If the loss was significant, then profit would be added back into the client's account by either allegedly buying additional Treasury *510 bills, or crediting to the client interest income from Senft & Co. The sheets summarizing the accounts of clients in 1978 indicates that Senft & Co. realized gain from Cantor, Fitzgerald & Co., Inc. (Cantor, Fitzgerald), a brokerage company, and that a part of such gain was distributed among Senft & Co. clients, including Beech Run, Mr. Castagno, Dr. Franks, and John Maring.
Sentinel Financial Instruments
In order to avoid sharing fees with ACLI, Mr. Senft formed Sentinel financial Instruments (SFI), a limited partnership, in October 1978. Mr. Senft was the sole general partner of SFI in 1978, 1979, 1980 and 1981. In November 1978 and March 1979, SFI promoted itself as a dealer of U.S. Government Securities; in September 1979, SFI promoted itself as a broker-dealer. SFI's office was initially located in Chicago, Illinois. In May 1979 SFI moved its operation from Chicago to Mr. Senft's apartment in New York, New York. At that time, SFI had three employees: Mr. Senft, Joseph Antonucci and Sally Schelby. In September 1979, SFI moved its operation from Mr. Senft's apartment to an office on Wall Street. During the fall of 1979, SFI had the following employees: Mr. Senft, *511 David Senft (Michael Senft's brother), Mr. Antonucci, Ms. Schelby, Norma Jean Curtin, Paz Pimental, and James Canton. In a document entitled Summary of Treasury Bill Hedging Program of SFI, which accompanied a Description of Treasury Bill Investment Program of SFI, dated November 16, 1978, it is stated that the objective of the hedging program is to "realize significant investment income in a future tax year while incurring lesser ordinary expense in the current tax year." The summary of SFI's hedging program described hedging as "the simultaneous establishment of equal long and short amounts of Treasury Bills having two or more maturity dates. As hedging can reduce risk it may also reduce the investors' opportunity for profits." The summary described the Federal income tax consequences resulting from SFI's clients' participation in the alleged hedging program as follows: "Losses incurred from the short sales are treated for Federal tax purposes as deductions from ordinary income. Code Section 1233(a); Reg. 1.1233-1(a)(1). Gains from the long positions are treated as unearned income for Federal tax purposes. Code section 1221(5); Reg. 1.1221-1(e)." This description of the *512 Federal tax consequences of the alleged hedging program is consistent with the tax opinion of a New York law firm which accompanied the summary and description of the SFI alleged hedging program. In a Description of Investment Programs for U.S. Government Securities, dated March 5, 1979, SFI stated that it offered two programs to sophisticated investors in upper income brackets: (1) Treasury Bill Program, and (2) Government Bond Program. Each of the petitioners, except Dr. McAllister, became a client of SFI in 1979. Dr. McAllister became a client of SFI in 1978. Prior to entering into the SFI purported investment programs, each petitioner received a copy of the appropriate SFI description of its purported investment program. According to the description of the investment programs, an investor in the Treasury bill program would "attempt to earn profits by simultaneously purchasing and selling short equal face amounts of T-bills." The SFI description further stated that an investor in the bond program would: attempt to earn long-term capital gains and interest income by investing in U.S. Government Bonds or Notes or Bonds issued with the guarantee of the U.S. Government *513 * * *. SFI will purchase Bonds for the investor having a yield to maturity (consisting of interest income and capital gain) which it estimates will exceed the net cost of carrying the Bonds for more than one year in the future. * * *
The description of the investment programs, which consists of 17 pages of text, includes a 6-1/2 page discussion of the tax considerations of the programs. Clients of SFI executed agreements that included a provision similar to the agreement with Senft & Co. appointing SFI as their agent with discretion too act for the clients. This agreement also provided, in part, that -- 7. SFI will effect transactions in Treasury Bills purchased and sold under the Program, acting as principal "dealer" selling for its own account to (or buying from its own account from) the customer. In transactions in which SFI acts as a dealer, it will sell or buy from the customer on a net basis at prices reflecting a retail mark-up or mark-down not more than the amount customarily charged by broker-dealers in U.S. Treasury Bills. * * * SFI may arrange financing for customers with banks, brokers or other lending institutions, or may itself advance credit to customers. *514 * * * On November 21, 1978, Dr. McAllister signed an agreement with SFI. Similar agreements were signed by Beech Run, John Maring, Mr. Castagno, Dr. Blomquist, Peter Maring and Dr. Franks. SFI utilized a customer's agreement that provided that all transactions would be subject to the rules of the exchanges or market and where applicable to the rules and regulations of the Securities and Exchange Commission. The agreement further provided that margins would be maintained as SFI required and debit balances would be paid on demand. The agreement further provided in part: 10. In all transactions between you and me, I understand that you are acting as dealers (selling government obligations or other bonds from your own trading position or inventory), except when you disclose to me in writing at or before the completion of a particular transaction that you are acting, with respect to such transaction, as brokers for some other person, or as agent on your behalf. SFI had each of its clients sign a document designated as limited power of attorney which purportedly authorized SFI to act as "agent and attorney-in-fact to buy, sell (including short sales) and trade in bonds, and *515 any other securities and or commodities and or contracts relating to the same on margin or otherwise in accordance with your [SFI] terms and conditions * * *." On December 18, 1979, Dr. Franks signed a document entitled as a limited power of attorney to SFI. Similar documents were signed by Beech Run, John Maring, Dr. Blomquist, Mr. Castagno, Peter Maring, and Dr. McAllister. SFI obtained its customers or clients through its own salesmen or Mr. Senft. In order to establish an account with SFI, a client paid a purported margin deposit. The purported margin deposit was a percentage of the tax loss requested by the client. The purported margin deposit was divided into three parts: (1) SFI's fee; (2) fee of SFI's salesmen; and (3) amount to be returned to customer at the end of his investment program. No money other than the purported margin deposit and a return of a predetermined portion of that purported deposit ever changed hands between SFI and its clients. Ms. Schelby was an employee of SFI from May 1979 to May 1980. She reported to Mr. Antonucci, who was employed at SFI as an accountant from June 1979 to March 1980. Ms. Schelby, Mr. Antonucci and David Senft entered *516 a customer's purported transactions on a "green sheet," which was a 13-column accounting pad piece of paper. They listed the customers' purported transactions on the "green sheet" based on prices listed in the Wall Street Journal on the date the entry was dated. Ms. Schelby did not call any broker or dealer to buy or sell the securities with respect to the purported transactions listed on the "green sheets;" she did not check SFI's inventory to determine whether it had the securities that the customer was purportedly buying. Thereafter other purported transactions such as coupon interest, interest paid, and gain on sales were listed on the "green sheets." After completing the listing of customers' purported transactions on the "green sheets," Ms. Schelby, Mr. Antonucci, and David Senft listed the purported transactions including the following information on pencil tickets: whether purportedly buying or selling security, description of purported security, price, and account number of SFI customer. The completed pencil tickets were time stamped. However, some blank pencil tickets were time stamped. The completed pencil tickets were given to the SFI keypunch department, which was *517 supervised by Ms. Curtin from August 1979 to December 1980. The keypunch department would enter the data on the pencil tickets into the computer. Purported confirmations of the transactions were generated from these tickets by ADP, a computer service that was not affiliated with SFI. In January 1980, SFI was supposed to send to its customers a monthly statement for December 1979 and a profit and loss statement detailing all of the 1979 transactions. However, the documents for many of SFI's customers were not timely issued due to errors, including clerical errors and miscalculation errors (either the customer had too much or too little loss for 1979). If the customer had too little or too much loss in 1979, then SFI would allegedly reconcile the account in 1980 by generating "as of" confirmations for transactions that allegedly occurred in 1979. The purported reconciliation of the 1979 accounts of SFI customers was completed by mid-March 1980. The untimely documents sent to SFI customers were backdated to January. SFI employees crumpled up and stepped on the letters that should have been mailed in the beginning of January 1980 in order to make them look like they had been *518 defaced by the postal service. Walter Raquet, a certified public accountant, was an employee of SFI from March to October 1980. Mr. Senft hired Mr. Raquet to prepare SFI's books and records for an audit on September 30, 1980, by the accounting firm of Peat, Marwick & Mitchell. In approximately May 1980, Mr. Raquet completed a liquidation schedule that listed the alleged customer accounts and their balances, such as margin deposits, salesman fees, long and short positions, and realized and unrealized income. The schedule indicated that the total liquidation value to SFI of the customer accounts was approximately $ 30 million and SFI would have had gains of $ 30 million. The purported liquidation schedule indicated to Mr. Raquet that SFI customer accounts were out of line with their margin deposits. The accounts were brought in line with their margin deposits through purported trades that were run through the books and records. The purported transactions were run through the accounts to bring them into line in order for them to pass audit and to look good for Internal Revenue Service purposes. Since no actual purchases and sales had been made for clients, the entries bringing *519 the accounts into line were likewise merely entries on the paper. When Mr. Raquet started working for SFI in March 1980, Mr. Canton kept records of market projections. However, he did not actually trade. In late March or early April 1980, Mr. Raquet set up a clearing account for Mr. Canton at Bradford Trust. Mr. Canton actually made certain purchases and sales some of which transactions would be run through the individual client's accounts. Mr. Canton's transactions were a small amount of the alleged account trades. Mr. Senft instructed Mr. Canton to make a few actual purchases and sales. Mr. Senft, without disclosing the reason to Mr. Canton, gave him these instructions in order to use the records of the few actual purchases and sales as "window dressing." Mr. Canton was not shown the customers' "green sheets."
Sentinel Government Securities
In June 1980, Mr. Senft formed Sentinel Government Securities (SGS), a New York limited partnership, to replace SFI, which he intended to close in 1980. SGS commenced operations on September 5, 1980. [6] The certificate of limited partnership and private placement memorandum list the following general partners of SGS: Mr. Senft, *520 SFI, and SGS, Inc. (an entity controlled by Mr. Senft). [7]
The certificate of limited partnership listed the business of SGS as trader, broker, dealer, and investor in securities, commodities, and currency. The private placement memorandum of SGS, dated September 15, 1980, includes the following description of SGS: The primary objective of the Partnership is to generate profits from operations. Along with that objective, substantial tax benefits may be available to the Partners. The Partnership will attempt to maximize the availability of current deductions, defer the inclusion of income, and realize and recognize a substantial portion of its profits as long-term capital gain.
The above description *521 of SGS' purported objectives is consistent with the following statements in the private placement memorandum: The nature of the Partnership's business is such that, while pursuing a primary profit-making objective, substantial tax benefits may be generated for a Limited Partner. In this regard, the Partnership will, whenever possible and when consistent with its profit-making objective, attempt to maximize current deductions, defer the inclusion of income, and realize and recognize long-term capital gain.
The Federal income tax consideations of an investor in the partnership are discussed in a 65-page opinion, which is an exhibit of the private placement memorandum. Mr. Senft proposed to provide limited partners of SGS with a four-to-one tax write-off based on a contribution of cash and a promissory note. The amount of the note was three times the amount of the cash contributed by the limited partner. SGS entered into an alleged trading program from October to December 1980 with Lasser-Marshall. According to the alleged trading program, SGS traded about $ 6 billion with Lasser-Marshall and received losses of $ 60 million and Lasser-Marshall received a commission of $ *522 600,000 for providing the service. Mr. Senft arranged for SGS to enter into the prearranged loss transactions with Lasser-Marshall for the purpose of obtaining deductible tax losses with the understanding that only a fee would be paid to Lasser-Marshall for generating those losses. SGS paid Lasser-Marshall the fee of $ 600,000 in six $ 100,000 installments. SGS entered into six alleged transactions with Lasser-Marshall in which SGS lost $ 100,000 each time to Lasser-Marshall. SGS provided all of the information concerning the alleged buying and selling of securities to Lasser-Marshall, which generated confirmations of the transactions exactly as furnished it by SGS. No securities were purchased, sold, or transferred between SGS and Lasser-Marshall. SGS and Lasser-Marshall started a second alleged $ 6 billion dollar trading program in the fall of 1981. According to the alleged trading program, SGS was to receive losses from this program and Lasser-Marshall was to receive a fee of $ 600,000 for its paperwork in providing the losses. The second alleged trading program was not completed due to the seizure of the records of SGS. In addition to the alleged trading programs with *523 Lasser-Marshall, SGS and Gill and Duffus Securities, Inc. (Gill and Duffus) agreed in December 1980 to a "tax roll" whereby Gill and Duffus would lose approximately $ 10 million to SGS in 1980. Gill and Duffus received a fee of approximately $ 62,500 or one-half to three quarters of a percent of the requested "tax roll." SGS and Gill and Duffus agreed that there would be no market risk to either of them from the paper transactions. There was an agreed limit on the daily balance of the accounts between SGS and Gill and Duffus. SGS and Gill and Guffus agreed if the balance exceeded the agreed amount because of daily market movement, the account would be traded back into balance through either market trades or backdated trades. The parties agreed there would be no payment of money between them other than the fee to be paid to Gill and Duffus for generating the losses. In addition to buying losses for its use, SGS sold tax losses to other entities. Berkeley Capital Partner (Berkeley Capital), a limited partnership unrelated to SGS was organized to be a tax shelter for its partners. In mid-December 1980, Berkeley Capital arranged a purported loss of $ 2 to $ 4 million with Mr. Orchard *524 of SGS for a commission of $ 75,000. After the transactions were completed, Mr. Orchard told Berkeley Capital that it owed an additional $ 25,000. It was agreed that Berkeley Capital could pay the fee by putting on a trade which would purportedly lose approximately $ 25,000. There was no exchange of securities or any actual purchase or sale of securities. [8]
CAM Investment (CAM) was a limited partner in SGS. Some of the petitioners in this case were partners in CAM. In 1980 CAM's ownership in SGS was 1.818 percent. In 1980 the K-1 issued to CAM by SGS showed an ordinary loss of $ 992,021. KBB Investments (KBB) was a limited partner in SGS, its ownership interest being 1.325 percent. Some of the petitioners in this case were partners in KBB. The K-1 issued to KBB by SGS in 1980 showed an ordinary loss *525 of $ 708,431.
The Securities Groups
In November 1979, the Securities Groups was a joint operating venture of two limited partnerships: (1) the Securities Group, which was formed in September 1978; and (2) the Monetary Group, which was organized in October 1979. Securities Group 1980, which was organized in July 1980, became a partner of the Securities Groups in 1980. On April 6, 1981, the Securities Groups announced the acquisition of New York Hanseatic, a division of Stuart Brothers. (Hereinafter this group is referred to as TSG.) In July 1981, New York Hanseatic Division of the Securities Groups was listed as a primary dealer in government securities. [9] TSG had limited partners who, as were the limited partners of SGS, were required to contribute cash and a note three times the amount of the cash contributed. The private offering circular of the Securities Group 1980, dated July 22, 1980, states *526 that the limited partnership's principal business would be a broker-dealer and market-maker in U.S. Government securities, U.S. Government Agency securities, money market instruments, financial futures, and foreign exchange. The offering circular includes an extensive description of the Federal income tax consequences of investment in Securities Group 1980. Additionally, a 38-page tax opinion, which was prepared by a Washington, D.C., law firm, is an exhibit of the offering circular. TSG provided tax losses to its limited partners in a manner similar to the manner in which SFI provided losses to individuals.
Litigation
On March 23, 1984, Mr. Senft, Walter Orchard, Mr. Antonucci, David Senft, and Frank Susi were indicted in U.S. District Court for the Southern District of New York with one count of violating section 371 of Title 18 concerning their activities at SFI and SGS. Mr. Senft was charged with 59 counts of aiding and assisting the filing of false tax returns in violation of section 7206(2); Mr. Antonucci and David Senft were charged with 31 such counts; Mr. Orchard and Mr. Susi were charged with 28 such counts. Mr. Senft was charged with one count of tax evasion *527 in violation of section 7201 and one count in subscribing to a false return in violation of 7206(1). Following a jury trial, Mr. Senft, Mr. Orchard, Mr. Antonucci and David Senft, but not Mr. Susi, were convicted of violating section 371 of Title 18. Mr. Senft, Mr. Antonucci, and David Senft were found guilty of 12 counts of violating section 7206(2); Mr. Orchard was found guilty of one count. Mr. Senft was convicted of tax evasion in violation of section 7201. In July 1984, Mr. Senft was sentenced to a 15-year term of imprisonment and Mr. Orchard to a 4-year term. Mr. Antonucci was sentenced to a 6-month term and David Senft to a 2-year term. In March 1985, the Court of Appeals for the Second Circuit affirmed the judgments of conviction entered against Mr. Senft, Mr. Orchard, Mr. Antonucci, and David Senft. Mr. Senft, who was serving his prison sentence at the time of the trial of the instant case, testified pursuant to a grant of immunity. He testified in detail of the fictitious nature of the purported Government securities transactions he conducted for his clients. In addition to the fictitious transactions Mr. Senft's entities arranged for their clients, these entities *528 may have also engaged in certain legitimate transactions.
Petitioners' Government Securities Transactions
(a) John S. Maring In 1977 John Maring invested in Beech Run as a limited partner. Beech Run was a customer of Senft & Co. from 1977 through 1979. In 1978 John Maring became aware of the Senft & Co. purported trading program through Mr. Burkhart, the general partner of Beech Run. John Maring then went to Chicago, Illinois, in order to meet and talk with Mr. Senft about his purported trading program. After returning to Portland, Oregon, and reading the information that he had received from Mr. Senft, John Maring decided to invest in the purported government securities transactions, and he recommended the investment to 25 to 40 people, including the other petitioners in the instant case. John Maring was a salesman of Senft & Co., SFI, and SGS from 1978 to 1980. He was to and did receive a fee of $ 16,100 for referring clients, including Mr. Castagno, Dr. Franks, and Dr. McAllister, to Mr. Senft in 1978. Clients referred to Senft & Co. by John Maring in 1978 were required to pay a "margin deposit" equal to 8 percent of their desired loss. John Maring earned *529 a fee of $ 80,775 for referring 17 individuals, including Dr. Blomquist, Peter Maring, Mr. Castagno, Dr. McAllister, and Dr. Franks, to SFI in 1979. Of the referral fee, $ 34,160 was treated as additional "margin deposit" of John Maring to SFI in November 1979. The remaining $ 46,615 was paid to John Maring in January 1980. Clients referred to SFI in 1979 by John Maring were required to pay a margin deposit equal to 12-1/2 percent of the loss requested in 1979. Of the 12-1/2 percent margin deposit, 7-1/2 percent was paid to SFI, 2-1/2 percent was to be returned to the client, and a 2-1/2 percent fee was to be paid to John Maring at the end of the program. In 1980 John Maring earned over $ 96,000 as a salesman of SGS. He referred three limited partnerships, including KBB and CAM, to SGS during 1980. John Maring contributed $ 25,000 and $ 4,784 in 1977 and 1979, respectively, to Beech Run. His reported distributive share of Beech Run's income or loss in 1977, 1978, and 1979 was the following: 1977
1978
1979 income
$ 2,033
loss [10]
($ 101,637)
($ 26,698)
*530 In 1978, John Maring made a margin deposit of $ 13,800 with respect to purported government securities transactions that were brokered by Senft & Co. with ACLI. With respect to the $ 13,800 margin deposit, John Maring reported the following amounts on his 1978 and 1979 Federal income tax returns: 1978
1979
loss
($ 231,675)
interest income
285,850 interest expense
(17,500)
(56,261)
investment management expense
( 8,340)
In 1979 John Maring made a margin deposit of $ 30,000 with SFI. With respect to the $ 30,000 margin deposit, he reported a loss of $ 375,888 resulting from "cancellation of forward contract." He also claimed a deduction of loan fee charges of $ 13,934. (b) Peter F. Maring Peter Maring relied solely on the advice of his brother, John Maring, when deciding to invest in purported government securities. He made a margin deposit of $ 6,250 with WFI in 1979. His check for the amount of the margin deposit was accompanied by a form letter to SFI in which he stated that he wanted to open a trading account in government securities "for profit." Identical letters were sent in October 1979 to SFI by Dr. Franks, Dr. McAllister, and *531 Dr. and Mrs. Blomquist and in March 1980 by Mr. Castagno and Dr. Blomquist as managing partners of CAM and KBB to SGS. As a result of the purported government securities transactions with SFI, Peter Maring claimed an ordinary loss of $ 48,344 [11] and a deduction for loan fee charges of $ 1,684 on his 1979 Federal income tax return. With respect to the purported government securities transactions, Peter Maring reported the following amounts and claimed the indicated interest expense deduction on his 1980 and 1981 returns: 1980
1981
ordinary loss
(56,358)
(28,082)
ordinary gain
61,612 interest income
[12] 24,176 short-term capital loss
( 2,188)
long-term capital gain
54,063 interest expense deduction
( 5,296)
( 1,650)
*532 Peter Maring contributed $ 51,282, and $ 18,000 to CAM in 1980 and 1981, respectively. CAM was an Oregon general partnership formed on October 1, 1980. It was a limited partner of SGS in 1980 and 1981 and in 1981 it was also a limited partner of the Securities Group 1980. With respect to his investment in CAM, Peter Maring reported the following amounts on his 1980 and 1981 Federal income tax returns: 1980 [13]
1981 [14]
Ordinary Loss
($ 39,564)
($ 15,053)
Short-term capital gain
502 3 Interest income
2 Investment interest expense
8,551 *533 (c) Lawrence J. Franks In 1978 Lawrence Franks heard about the purported tax straddle investment opportunity from John Maring. In 1978 Dr. Franks made a margin deposit of $ 20,800 for purported government securities transactions to be brokered by Senft & Co. with ACLI. As a result of the purported ACLI transactions, Dr. Franks reported a loss of $ 237,646 on his 1978 Federal income tax return and claimed deduction for interest expense of $ 14,236 and investment management fees of $ 8,000. In 1979 he reported a gain of $ 231,288.10 with respect to his 1978 margin deposit. In 1979 Dr. Franks made a margin deposit of $ 66,250 with SFI. With respect to this margin deposit, Dr. Franks purportedly realized a gain of $ 284,491.26, a loss of $ 797,258.34, and had loan fee charges of $ 18,895.92. On his 1979 return, Dr. Franks reported a loss of $ 281,479 with respect to the government securities transactions. He claimed a deduction for interest expense of $ 18,896. [15]
*534 (d) Robert H. and Karen I. Blomquist Karen Blomquist is responsible for investigating and analyzing investment opportunities on behalf of her family. In 1978, she became aware of purported investments in government securities from John Maring. She talked about the investment with the staff of SFI and her fellow students. She understood the basic concepts, but not the details of investing in government securities. In 1979, Dr. and Mrs. Blomquist made a margin deposit of $ 5,000 with SFI. As a result of their purported government securities transactions with SFI, Dr. and Mrs. Blomquist reported the following amounts on their 1979, 1980, and 1981 FEderal income tax returns: 1979
1980
1981
loss
[16] (37,574)
(50,095)
(21,076)
interest income
49,290 19,190 long-term capital gain
44,500 They claimed a deduction for interest expense of $ 3,149 in 1979 and of $ 473 in 1981. In 1980 they claimed *535 a deduction of $ 3,531 as a loan fee and in 1981 claimed a loan fee deduction of $ 473. [17]
Dr. Blomquist contributed $ 72,276 and $ 105,685 to KBB in 1980 and 1981, respectively. KBB is an Oregon general partnership formed on October 1, 1980. In addition to being a limited partner of SGS in 1980 and 1981, KBB was a limited partner of the Securities Group 1980 in 1981. Dr. Blomquist reported as his distributive share of KBB's items of income and deductions in 1980 and 1981 the following: 1980
1981 [18]
ordinary loss
(72,984)
(88,213)
interest income
12 short-term capital gain
708 20 *536 (e) Thomas H. McAllister Dr. McAllister, became aware of purported Treasury-bill straddle investments from John Maring in 1978. In deciding whether to invest in the purported government securities transactions, he relied on the advice of John Maring and read the circulars offered by Mr. Senft. Dr. McAllister made a "margin deposit" of $ 4,000 with SFI in 1978. On his Federal income tax return for 1978, Dr. McAllister reported with respect to this deposit an ordinary loss of $ 47,173 and deducted investment expense of $ 4,000. In 1979 Dr. McAllister made a "margin deposit" of $ 12,500 with SFI. With respect to his purported government securities transactions, Dr. McAllister reported a loss of $ 31,071 on his 1979 Federal income tax return and claimed deductions for investment expense in the amount of $ 20,798. The net loss of $ 31,071 in 1979 was presumably calculated as follows: gain of $ 65,956, with respect to the 1978 margin deposit less a loss of $ 97,027 with respect to the 1979 margin deposit. On his 1980 and 1981 returns, Dr. McAllister reported the following with respect to his government securities transactions: 1980
1981
ordinary loss
($ 118,163)
($ 104,337)
coupon interest
140,731 99,588 long-term capital gain
99,750 *537 He also claimed a deduction of $ 19,926 as investment expense/loan fees in 1980 and of $ 4,985 in 1981. Dr. McAllister contributed $ 65,443 and $ 138,081 to KBB in 1980 and 1981, respectively. With respect to his KBB investment, Dr. McAllister reported the following amounts on his 1980 and 1981 Federal income tax returns: 1980
1981
ordinary loss
[19] ($ 66,090)
[20] ($ 115,281)
interest income
16 short-term capital gain
641 27 (f) David C. Castagno In 1978 David Castagno became aware of the purported Treasury-bill straddle investment *538 through John Maring. He relied on the advice of John Maring concerning the investment opportunity. In November 1978, Mr. Castagno made a "margin deposit" of $ 2,400 with ACLI through Senft & Co. With respect to the purported securities transactions brokered by Senft & Co., Mr. Castagno claimed an ordinary loss of $ 25,548.20 [21] and a deduction for an investment management fee of $ 2,400 on his 1978 Federal income tax return. In 1979 Mr. Castagno made a "margin deposit" of $ 7,500 with SFI. On his 1979 return, Mr. Castagno claimed a loss of $ 29,592.40 [22] and a deduction for interest expense of $ 6,770.13 with respect to the purported government securities transactions. Of the interest expense deduction, $ 3,542 is attributable to Mr. Castagno's alleged transactions with SFI. *539 On his 1980 and 1981 Federal income tax returns, Mr. Castagno reported the following amounts with respect to the 1979 margin deposit of $ 7,500: 1980
1981
ordinary loss
($ 70,372.64)
($ 54,393.81)
coupon income
73,990.49 45,071.67 long-term capital gain
70,281.25 short-tem capital loss
[23] (1,897.50)
He claimed an interest expense deduction of $ 3,241.80 in 1980 and $ 1,744.10 in 1981 with respect to his government securities transactions. Mr. Castagno was a partner of CAM in 1980 and 1981. [24] He contributed $ 29,630 and $ 48,000 to CAM in 1980 and 1981, respectively. On his 1980 and 1981 returns, Mr. Castagno reported his distributive share of CAM items of income and loss as follows: 1980
1981 [25]
ordinary loss
(27,800)
(40,074)
interest income
5 dividends
1 short-term capital gain
290 9 investment interest expense
(4,941)
*540 Notices of Deficiency
(a) John S. Maring Respondent in his notice of deficiency to John Maring adjusted his distributive share of Beech Run income and loss in the years 1977, 1978 and 1978, with the following explanation: It is determined that your distributive share of the income/[loss] from Beech Run, Ltd., is $ 23,101.00, $ 160,420.00 and $ 216,680.00 in lieu of the [$ 101,637.00], $ 2,033.00 and [$ 26,689.00] as reported on your 1977, 1978 and 1979 tax returns, respectively. See computation below. Beech Run Limited
1977
1978
1979
Ordinary income per return
($ 1,911,795)
$    38,234 ($   459,091)
Adjustments:
(1) Treasury Bill Trading
1,705,712 2,774,033 4,115,377 (2) Loan Fees
40,778 85,787 59,930 (3) Advisory Fee
65,599 17,250 49,575 (4) Office Expense
11 68 52 (5) Amortization
2,214 26,570 26,570 (6)  Administrative Fees
12,000 5,000 (7) Interest Expense
18,774 20,783 (8) Taxes Expense
2,418 15 (9) Coal Mining Expense
40,799 (10) Tipple Expense
2,328 (11) Legal Expense
2,555 (12) Royalty Expense
520,000 6,241 260,000 Ordinary Income as Adjusted
$   434,519 $ 3,017,502 $ 4,075,766 Your Percentage of
Distribution
5.3163%
5.3163%
5.3163%
Your Distributive Share
$    23,101 $   160,420 [26] $   216,680 *541 Respondent disallowed John Maring's claimed deduction of losses resulting from purported government securities transactions with Senft & Co. in 1978 and 1979 with, in part, the following explanation: the losses claimed by you on your income tax returns for 1978 and 1979 involving T-bill transactions with Senft and Company cannot be recognized since such alleged transactions are shams entered into for tax avoidance purposes, and lack of any economic substance. As a result of the disallowance of the losses, respondent increased John Maring's *542 1978 and 1979 taxable income by $ 411,296 and $ 1,920,527, respectively, calculated as follows: 1978
1979
Total Gain in Net Gain (Loss) Reported
$ 179,621 $ 2,206,377 Total Loss in Net Gain (Loss) Reported
(411,296)
(1,920,527)
Net Gain (Loss) per Return
($ 231,675)
$   285,850 Adjustment-Eliminate Gross Losses
$ 411,296 $ 1,920,527 The amount of $ 285,850 was reported by John Maring in 1979 as interest income on U.S. Treasury bills. Respondent disallowed John Maring's deduction of losses attributable to alleged government securities transactions with SFI in 1979. The notice of deficiency stated that the losses "cannot be recognized since such alleged transactions are shams entered into for tax avoidance purposes, and lack any economic substance." The disallowance of the losses resulted in John Maring's taxable income being increased in the amount of $ 612,876, calculated as follows: 1979
Total Gain in Net Gain (Loss) Reported
$  236,988 Total Loss in Net Gain (Loss) Reported
( 612,876)
Net Gain (Loss) per Return
($ 375,888)
Adjustment-Eliminate Gross Losses
$  612,876 Respondent disallowed *543 John Maring's claimed deduction of interest expense with respect to purported Treasury bill transactions in the amounts of $ 17,500 and $ 56,261 in 1978 and 1979, respectively. Respondent also disallowed the claimed deduction of management fees in the amount of $ 8,050 in 1979.
(b) Peter F. Maring Respondent disallowed Peter Maring's claimed deduction of loss in the amount of $ 48,344 with respect to his alleged government securities transactions in 1979 with the explanation that the transactions were shams without economic substance. Respondent disallowed Peter Maring's deduction of short-term capital loss in the amount of $ 2,188 concerning purported Treasury bill transactions in 1980, increasing his taxable income by $ 875, computed as follows: Short-Term Capital Gain (Loss) Per Return
(10,120)
Disallow Treasury Bill Loss
2,188 Short-Term Capital Gain (Loss) as Corrected
(7,932)
Plus Long-Term Capital Gain (Loss) Per Return
61,292 Net Gain or (Loss) as Corrected
53,360 Less Section 1202 Deduction
(32,016)
Taxable Gain or (Loss) as Corrected
21,344 Taxable Gain or (Loss) Per Return
20,469 Adjustment to Tax Table Income
875 *544 The explanation for the adjustment was that the alleged transactions were shams without economic substance. Respondent disallowed Peter Maring's deduction of ordinary loss of $ 28,082 concerning alleged Treasury bill transactions in 1981, with, in part, the following explanation: It is determined that the losses claimed by you on your income tax return for 1981 involving Government securities cannot be recognized since such alleged transactions are shams entered into for tax avoidance purposes, and lack any economic substance. Respondent also determined that Peter Maring's 1981 gain from the alleged forward contract transactions in the amount of $ 54,063 was short-term capital gain instead of long-term capital gain, as reported on the 1981 return. As a result of the recharacterization of the gain, respondent increased Peter Maring's taxable income by $ 18,209, calculated as follows: Short-Term Capital Gain (Loss) Per Return
(19,693)
Plus T-Bill Gains
54,063 Short Term Capital Gain (Loss) As Corrected
34,370 Plus Long-Term Gain (Loss) As Corrected
(4,022)
Net Gain or (Loss) As Corrected
30,348 Less Section 1202 Deduction
-0-  Taxable Gain or (Loss) As Corrected
30,348 Taxable Gain or (Loss) Per Return
12,139 Adjustment to Taxable Income
18,209 *545 Respondent disallowed Peter Maring's claimed deduction of interest expense with respect to alleged government securities transactions in the amounts of $ 1,684, $ 5,296 and $ 1,650 in 1979, 1980 and 1981, respectively. Respondent determined that Peter Maring's distributive share of CAM's loss was zero instead of the claimed losses of $ 39,564 and $ 15,053, respectively, shown on his 1980 and 1981 returns. Respondent disallowed Peter Maring's claimed deduction of investment interest expense with respect to Treasury security transactions in the amount of $ 8,551 in 1981. (c) Lawrence J. Franks Respondent disallowed Dr. Frank's claimed deduction of losses in the amounts of $ 237,646 and $ 281,479 with respect to his alleged Treasury bill transactions in 1978 and 1979, respectively. Respondent also disallowed the claimed deduction of management investment fees of $ 8,000 in 1978. Additionally, respondent disallowed claimed interest expense deductions with respect to alleged Treasury bill transactions in the amounts of $ 14,236 and $ 18,896 in 1978 and 1979, respectively. Respondent's explanation of these adjustments was that the alleged government security transactions were *546 shams entered into for tax avoidance purposes. (d) Robert H. and Karen I. Blomquist Respondent disallowed Dr. and Mrs. Blomquist's claimed deduction of loss involving their purported government securities transactions in 1979, 1980 and 1981, increasing their taxable income in 1979, 1980 and 1981 in the amounts of $ 37,663, $ 50,095 and $ 21,076, respectively, with, in part, the explanation that the alleged government securities transactions were shams entered into for tax avoidance purposes. The interest income of $ 49,290 and $ 19,190 that was reported in 1980 and 1981, respectively, with respect to the government securities transactions, was not excluded from income. Respondent disallowed Dr. and Mrs. Blomquist's claimed deduction of interest expense in the amount of $ 3,149 and $ 473 in 1979 and 1981, respectively, and the claimed deduction of loan fees in the amount of $ 3,531 and $ 473 in 1980 and 1981, respectively, all claimed in connection with the alleged government securities transactions. Respondent determined that the gain from the alleged forward contract transactions in the amount of $ 44,500 for 1981 was short-term capital gain rather than long-term capital *547 gain, as reported by Dr. and Mrs. Blomquist. As a result of the recharacterization of the gain, respondent increased the 1981 taxable income of Dr. and Mrs. Blomquist by $ 26,700. Respondent determined that Dr. and Mrs. Blomquist's correct distributive share of KBB's losses was zero rather than losses of $ 72,984 and $ 88,213, claimed on their returns for 1980 and 1981, respectively. Respondent explained that the claimed losses are not allowable because the transactions that created the claimed losses were shams entered into for tax avoidance purposes.
(e) Thomas H. McAllister Respondent disallowed Dr. McAllister's claimed losses involving his alleged government securities transactions in 1978, 1979, 1980 and 1981, increasing his reported income by the amount of $ 47,173, $ 97,027, $ 118,163 and $ 104,337 in those years, respectively with the explanation that the transactions were shams and lacked economic substance. Respondent determined that the gain from the alleged forward contract transactions in the amount of $ 99,750 reported in 1981 was short-term capital gains rather than long-term capital gain. As a result of the recharacterization of the gain, respondent increased *548 Dr. McAllister's 1981 taxable income by $ 61,108, computed as follows: Net Short-Term Capital Gain
$ 102,803
Net Long-Term Capital Gain (Per Return)
41,695
$  61,108
Respondent disallowed Dr. McAllister's claimed deductions for investment expenses/loan fees/management fees involving the alleged Treasury bill transactions in the amounts of $ 4,000, $ 20,798, $ 19,926 and $ 4,985 in 1978, 1979, 1980 and 1981, respectively, explaining that the claimed deductions were incurred in sham transactions entered into for tax avoidance purposes. Respondent determined that Dr. McAllister's distributive share of KBB losses was zero instead of $ 66,009 and $ 115,281, which he claimed as deductions in 1980 and 1981, respectively, explaining that the transactions that created the claimed losses were shams entered into for tax avoidance purposes.
(f) David C. Castagno Respondent disallowed Mr. Castagno's claimed loss deductions from his purported government securities transactions, increasing his taxable income by $ 25,548, $ 58,368, $ 70,373 and $ 54,394 in 1978, 1979, 1980 and 1981, respectively. Respondent also disallowed Mr. Castagno's claimed deduction for investment *549 management fees of $ 2,400 in 1978, and his claimed deduction of interest expense in the amounts of $ 6,770, $ 3,242 and $ 1,744 in the years 1979, 1980 and 1981, respectively. Respondent explained these adjustments on the basis that the transactions were shams lacking in economic purpose. Respondent disallowed Mr. Castagno's claimed short-term capital loss of $ 2,188 in 1980, increasing his reported 1980 income by $ 290 and eliminating the claimed loss carryover of the $ 1,898 to 1981. Respondent also determined that Mr. Castagno's reported gain of $ 70,281 from alleged forward contract transactions in 1981 was short-term capital gain rather than long-term capital gain, as reported on his return. Due to the conversion of the long-term capital gain to short-term capital gain and the elimination of the short-term capital loss carryover, Mr. Castagno's 1981 taxable income was increased by $ 42,933, calculated as follows: 1980
1981
Short-Term Gain (Loss) Per Return
(1,898)
(1,889)
Disallowance of Treasury Notes Loss
2,188 1,898 Plus: U.S. Treasury Notes Gain
-   70,281 Corrected Short-Term Capital Gain (Loss)
290 70,290 Plus: Long-Term Capital Gains (Loss)
-0-  -0-  Net Capital Gain (Loss) as Corrected
290 70,290 Less: Section 1202 Deduction
-0-  -0-  Taxable Gain (Loss) As Corrected
290 70,290 Taxable Gain (Loss) Per Return
-0-  27,357 Adjustment to Tax Table or Taxable Income
290 42,933 *550 Respondent determined that Mr. Castagno's distributive shares of CAM losses were zero instead of $ 27,800 and $ 40,074 as claimed on his 1980 and 1981 returns, respectively. Respondent explained that CAM's alleged government securities transactions were shams entered into for tax avoidance purposes. Respondent disallowed Mr. Castagno's claimed deduction for investment interest expense of $ 4,941 alleged to have been paid with respect to CAM in 1980. OPINION
Losses
Petitioners argue that the deductibility of their losses resulting from the purported government securities transactions should be determined by section 108 of the Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494, 630-631, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085, 2817. [27] Specifically, petitioners rely on Wehrly v. United States,808 F.2d 1311, 1314 (9th Cir. 1986), which held that losses resulting from straddle transactions are deductible if the investor had a reasonable expectation of any profit. [28]
*551 Respondent's determination in this case is that the purported government securities transactions in issue herein were not bona fide but were shams. In Sochin v. Commissioner,843 F.2d 351, 353 n. 6 (9th Cir. 1988), affg. Brown v. Commissioner,85 T.C. 968, 998 (1985), petition for certiorari filed May 19, 1988, the Court stated that section 108 does not apply unless the Court determines that the transaction itself is bona fide and not a sham. See also Katz v. Commissioner,90 T.C. 1130, 1137 (1988); Forseth v. Commissioner,85 T.C. 127, 166 (1985), affd. 845 F.2d 746, 748 (7th Cir. 1988), affd. sub nom. Enrici v. Commissioner,813 F.2d 293, 295 n. 1 (9th Cir. 1987), affd. sub nom. Mahoney v. Commissioner,808 F.2d 1219, 1220 (6th Cir. 1987), affd. without published opinion sub nom. Bramblett v. Commissioner,810 F.2d 197 (5th Cir. 1987), affd. without published opinion sub nom. Wooldridge v. Commissioner,800 F.2d 266 (11th Cir. 1986). In Forseth v. Commissioner,85 T.C. at 149-164, we listed six factors which *552 we considered in determining that transactions involving forward contracts in gold and platinum ere factual shams. These factors were (1) the correlation of tax needs and purported losses; (2) the predictability of tax losses; (3) the "margin" requirements; (4) zeroing-out account balances; (5) whether the evidence showed that opposite positions were actually entered into with market-making brokers to lay-off trade; and (6) manipulation of trading records. See Freytag v. Commissioner,89 T.C. 849, 876-877 (1987), where we stated that in determining whether a purported transaction is a sham, "we have focused first on whether the purported transactions existed in substance and were not merely a paper trail for tax deductions." Based on the record in this case, we conclude that petitioners' purported government securities transactions with Senft & Co./ACLI, SFI, SGS, and Securities Group 1980 were not bona fide. The purported government securities transactions through the Senft-controlled entities were for the sole purpose of generating tax losses for clients and limited partners. See Brown v. Commissioner,85 T.C. at 998. The instant case involves *553 an elaborate scheme of fictitious transactions. The scheme was masterminded by Mr. Senft who established and controlled various entities to effectuate his scheme. Senft & Co., the first entity used by Mr. Senft in furtherance of his scheme, was formed in 1975 or 1976 to act as a middleman between individuals who needed tax benefits and brokerage firms that would provide them. Beech Run, a limited partnership of which John Maring was a partner, became a client of Senft & Co. in 1977. John Maring, Mr. Costagno, and Dr. Franks became clients of Senft & Co. in 1978. Their margin deposits were set at 8 percent of their requested tax loss. The clients of Senft & Co. executed client agreements that gave Mr. Senft, the investment manager of Senft & Co., complete discretion to trade their accounts. Senft & Co. purportedly brokered its clients' accounts through ACLI, a primary dealer in government securities. Mr. Senft chose the securities and prices of all trades that were allegedly executed by ACLI. However, the record contains no evidence that securities were actually bought or sold by ACLI. Instead, the evidence indicates that ACLI merely generated the paperwork to be provided *554 by Senft & Co. to its clients in order to substantiate their claimed tax losses. Mr. Senft's testimony clearly states that the arrangement of Senft & Co. with ACLI was that ACLI would provide the paperwork for tax losses. The records show a split in the fee for providing the tax losses between Senft & Co. and ACLI and an understanding that the fee referred to as "margin deposit" was the only payment ever to be made by a client. [29]
*555 The second entity, SFI, was formed in October 1978 in order for Mr. Senft to avoid splitting fees with ACLI. Clients of SFI, including petitioners, executed agreements authorizing SFI to manage their trading in government securities. SFI clients executed powers of attorney authorizing SFI "as agent and attorney-in-fact to buy, sell (including short sales) and trade in bonds, and any other securities and or commodities and or contracts relating to the same on margin." Despite the agreements between SFI and its clients, including petitioners, the evidence shows that SFI did not actually buy or sell securities on behalf of its clients. Rather, SFI purportedly "bought and sold" securities by referring to prices listed in the Wall Street Journal, completing pencil tickets and entering these tickets into a computer in order to generate the paperwork necessary for its clients to claim deductions for losses resulting from their purported government securities transactions. The amount of securities purportedly "bought and sold" by SFI was determined by the requested tax loss of SFI's clients, which in turn determined the amount of "margin deposit" paid by SFI clients. If SFI realized *556 that a client had too much or too little loss, then SFI manipulated the records in order to obtain the requested tax loss. Here, as in Price v. Commissioner,88 T.C. 860, 864-865 (1987), no securities were actually bought or sold by SFI but all purported trades were predetermined.[30]
The third entity is SGS, formed in June 1980 with the intent that it replace SFI. SGS's certificate of limited partnership listed its business as trader, broker, and investor in securities, commodities, and currency. The major business of SGS, however, was the business of buying and selling tax losses through purported government securities transactions with other entities, including Lasser-Marshall, Gill and Duffus, and Berkeley Capital. The evidence shows that not securities were exchanged; rather, the evidence establishes that the transactions were merely book entries. Accordingly, CAM and KBB, which were limited partners *557 of SGS in 1980 and 1981, are not entitled to deduct their distributive share of claimed SGS losses. [31]
The fourth entity is the Securities Groups. This entity was a partnership or joint venture of the (1) Securities Group; (2) Monetary Group; and (3) Securities Group 1980. In 1981, CAM and KBB were limited partners of the Securities Group 1980. The evidence shows that the purported government securities transactions allegedly executed by the Securities Group 1980 were not bona fide. No actual purchases or sales occurred. Thus, CAM and KBB are not entitled to deduct their purported 1981 distributive share of Securities Group 1980 claimed losses. The record shows that petitioners' purported government securities transactions were not real, but illusory. Accordingly, petitioners are not entitled to deduct the purported losses that they incurred as clients of the Senft entities, as limited partners of partnerships that were clients of entities controlled by Mr. Senft, *558 or as general partners of partnerships that were limited partners of entities controlled by Mr. Senft. Petitioners contend that if we determine that their purported securities transactions were shams and that there were no bona fide transactions, the income and gains reported by them from these transactions should be eliminated as well as the losses. Glass v. Commissioner,87 T.C. 1087, 1177 (1986). Respondent does not disagree with this contention. Clearly the entries on petitioners' records (particularly the "green sheets") of coupon interest and gain were just as fictitious as the loss entries. Petitioners received nothing nor was it intended that they receive anything from the transactions other than purported tax losses and a return of a small portion of their "margin deposit." Respondent does not disagree with this contention. Clearly the entries on petitioners' records (particularly the "green sheets") of coupon interest and gain were just as fictitious as the loss entries. Petitioners received nothing nor was it intended that they receive anything from the transactions other than purported tax losses and a return of a small portion of their "margin *559 deposit." Respondent has in some instances disallowed the claimed losses from the transactions but left in income from purported coupon interest and gain. This reported income should be removed. It is not clear that anything other than the net losses from the partnerships were disallowed. However, if purported income of the partnership from the fictitious transactions was not removed, it should be. Glass v. Commissioner,87 T.C. at 1177. Our holding that petitioners actually had not purchases and sales of government securities, disposes of the issue raised in this case. However, the record here is unmistakably clear that each petitioner entered into the purported transactions with the Senft entities solely to obtain tax losses. The payments petitioners made to the Senft entities were based on the tax loss they requested. This fact shows not only that petitioners had no intent to make a profit but also there was no possibility of a profit resulting from the transactions since what petitioners purchased was merely a tax loss. Therefore, it is unnecessary to discuss whether in real purchases and sales of government securities of specified quantities there might *560 be some possibility of profit. But see Ewing v. Commissioner, 91 T.C.    (August 30, 1988) and Goswell v. Commissioner,91 T.C. 151 (1988). Petitioners purchased only tax losses. We do not believe their testimony to the contrary in light of the other evidence of record. [32] Some of petitioners even testified that they had prepared letters which they sent to SFI stating that they wished to enter into transactions "for profit." Not only does other evidence in the record show that these letters were form letters furnished to petitioners, but this fact was also admitted by petitioners' counsel. *561 Section 163
Petitioners argue that they incurred and paid interest expense in one or more years as a result of the purported government securities transactions. Petitioners argue that in any event the interest expense is deductible under section 163. We do not agree that petitioners are entitled to interest expense deductions related to the purported government securities transactions. Petitioners did not actually pay any interest but rather the purported interest payments were merely another fictitious entry on the fictitious records. Petitioners not only made no interest payments, they had no genuine indebtedness with respect to the fictitious government securities transactions since no real indebtedness existed. Cf. Rose v. Commissioner,88 T.C. 386, 423 (1987), on appeal (6th Cir. 1987).
Section 212
Petitioners argue that alleged fees paid by them with respect to their government securities transactions are deductible under section 212. [33] We disagree with petitioners. We have found that petitioners' purported government securities transactions were illusory, not real. The sole purpose of the government securities transactions was *562 to provide tax deductions for clients and partners of entities controlled by Mr. Senft. Therefore, the fees paid by petitioners with respect to their alleged government securities transactions were not for the pruoduction of income. Rather, they were amounts paid to obtain a tax loss. Accordingly, such fees are not deductible under section 212. Brown v. Commissioner,85 T.C. at 1000. See Price v. Commissioner, at 88 T.C. at 886; Forseth v. Commissioner, 85 at T.C. at 165-166. Section 6653(a)
Respondent in his notice of deficiency determined that Dr. McAllister was liable for the addition to tax under section 6653(a) [34] for the years 1978 and 1979. In his amended *563 answer as to Dr. McAllister, respondent alleged that the was liable for the addition to tax under section 6653(a) for 1980 and under section 6653(a)(1) and (a)(2) for 1981. Respondent in his amended answers alleged that the remaining petitioners were liable for the addition to tax for negligence under section 6653(a) for the years 1976 through 1980 and under section 6653(a)(1) and (a)(2) for the year 19xcept for the 1978 and 1979 years of Dr. McAllister, responds the burden of providing that petitioners are liable for theion to tax under section 6653(a) for years 1976 throughand under section 6653(a)(1) and (a)(2) for the year 1981. 12(a). We find that Dr. McAllister did not meet his burden ving that he is not liable for the addition to tax under s 6653(a) for 1978 and 1979 and that respondent has met his of proving that Dr. McAllister is liable for the additionx for negligence for 1980 and 1981. Respondent also met his of proof concerning the addition to tax for negligerh respect to the remaining petitioners. *564 Sec653(a) (for 1976 through 1980) and section 6653(a)(r 1981) apply when any part of an underpayment is due to nnce or intentional disregard of rules and regulatiNegligence is defined as "lack of due care or failure what a reasonable and ordinarily prudent person would do the circumstances." Neely v. Commissioner,85 T.C. 934, 947), citing Marcello v. Commissioner,380 F.2d 499, 506 (5th1967). We held that the purported government securities transactn the instant case were fictitious. We are convincedJohn Maring, who was knowledgeable and sophisticith respect to business and tax matters, knew or at a minimumd have known that the transactions in issue were fictitiouvertheless, John Maring claimed deductions resultingthese fictitious transactions on his Federal income tax returns. Brown v. Commissioner,85 T.C. at 1001. John Maring was a salesman of Senft & Co., SFI, and SGS, and certainly in this capacity knew that there were no actual purchases and sales for government securities but merely payments by clients to these entities for tax losses. John Maring clearly was negligent in claiming deductions for these purported losses. *565 The record is not clear as to whether the remaining petitioners knew that the alleged government securities transactions were fictitious when they were entered into. However, we find that the remaining petitioners, who have business or professional careers, did know that they were merely purchasing tax losses. At a minimum they should have known this fact if they had investigated the purported government securities programs offered by the Senft entities. See Freytag v. Commissioner,89 T.C. at 888; Forseth v. Commissioner,85 T.C. at 167. The remaining petitioners, except Karen Blomquist who conducted limited research, testified that they relied on John Maring's analysis of the purported government securities programs offered by Senft-controlled entities. We hold on the basis of this record that the other petitioners did know that these payments to the Senft entities were solely for the purchase of tax losses even if they did not know all the purported transactions were fictitious. Mr. Senft and certain employees of the Senft entities testified that the fee charged to clients was based on the amount of tax loss the client wished to be generated. *566 The amount of the loss requested was entered on the client's records. The record as a whole contradicts petitioners' self-serving testimony that they invested in purported government securities transactions in order to earn a profit or increase their net worth. Section 6653(a)(2) applicable to the yar 1981 imposes an addition to tax on the portion of the deficiency due to negligence. The record here shows negligence only with respect to each petitioner's Senft transactions and the claimed partnership losses. Certain issues in this case were settled and respondent has failed to show that any portion of the deficiency of any petitioner resulting from settled issues was due to negligence.
Section 6621(c)
Respondent argues that petitioners are liable for the additional interest on substantial underpayments of tax attributable to tax motivated transactions pursuant to section 6621(c). Respondent raised the section 6621(c) issue by amended answers as to Dr. Franks and the 1979 tax year of Peter Maring. Therefore, respondent bears the burden of proof on the issue as to each of these petitioners. Rule 142(a). Respondent determined the applicability of section 6621(c) *567 in notices of deficiency as to the 1980 and 1981 years of Peter Maring and Dr. Blomquist, Dr. McAllister, John Maring, and Mr. Castagno. These petitioners bear the burden of proving respondent's determination to be erroneous. Rule 142(a). Section 6621(c)(1) provides that "with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest" shall be 120 percent of the standard underpayment rate. The term "substantial underpayment attributable to tax motivated transactions" means an underpayment of taxes in excess of $ 1,000 that is attributable to one or more of the tax motivated transactions set forth in section 6621(c)(3). Section 1535(a) of the Tax Reform Act of 1986, Pub. L.No. 99-514, 100 Stat. 2085, 2740, amended section 6621(c)(3)(A) to include sham or fraudulent transactions within the list of tax motivated transactions. [35] The amendment applies to interest accruing after December 31, 1984, except such amendment is not applicable to a case of an underpayment with respect to which there was a final decision before the enactment of the Tax Reform Act of 1986 (October 22, 1986). Price v. Commissioner,88 T.C. at 888; *568 DeMartino v. Commissioner,88 T.C. 583, 587 (1987). In the instant case, we have held that petitioners are not entitled to deduct losses resulting from their purported government securities transactions because such transactions were fictitious and were shams. Therefore, petitioners' government securities transactions were tax motivated transactions within the meaning of section 6621(c)(3)(A). Accordingly, *569 we hold that the increased rate of interest provided by section 6621(c) is applicable with respect to petitioners' underpayments attributable to their government securities transactions if such underpayments exceed $ 1,000 in each year. See Price v. Commissioner, supra;DeMartino v. Commissioner, supra.
Section 6673
At the close of the trial, the Court took under advisement respondent's motion that damages be awarded to the United States under section 6673 with respect to each petitioner. Section 6673 provides that this court may award to the United States damages in an amount not in excess of $ 5,0000 "Whenever it appears to the Tax Court that proceedings before it have been instituted or maintained by the taxpayer primarily for delay, or that the taxpayer's position in such proceeding is frivolous or groundless." [36]
Petitioners deducted substantial losses resulting from their purported investments in Treasury bill straddles *570 over the course of several years. We have found that these purported government securities transactions were not bona fide. We have concluded that John Maring knew or reasonably should have known that the transactions were shams at the time when he entered into them. Although the record is not clear that the remaining petitioners knew that the transactions were shams when they entered into them, they did know that the transactions were entered into solely for the purpose of tax benefits. Also each of these petitioners was certainly aware of the nature of these transactions prior to the time of the commencement of the trial of this case. However, there were numerous other issues in these cases which were settled, so on this record it does not appear that the case was instituted primarily for delay. Except for the fact that respondent had disallowed claimed losses from the purported government securities trading without eliminating income reported from those purported transactions, the maintenance of these cases after these other issues were settled would appear to be primarily for delay. Petitioners' position in these cases as to deduction of losses from the purported government *571 securities transactions is certainly frivolous and groundless. However, their positions with respect to the income reported from those transactions is not. Considering all the circumstances here present, we conclude to exercise our judgment not to award damages. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Peter F. Maring and Bettie L. Maring, docket Nos. 26302-83, 29878-85; Lawrence J. Franks and Jonelle Franks, docket No. 2662-84; Robert H. Blomquist and Karen I. Blomquist, docket No. 29168-85; Thomas H. McAllister and Veda J. McAllister, docket No. 29354-85; John S. Maring, Laura J. Maring, and Rosemary E. Lindquist (formerly Rosemary E. Maring), docket No. 29731-85; and David C. Castagno and Darla J. Castagno, docket No. 29873-85. ↩
2. All section references (except section 108 of the Deficit Reduction Act of 1984 (Division A -- Tax Reform Act of 1984), as amended by the Tax Reform Act of 1986) are to the Internal Revenue code, as amended and in effect during the years in issue, and all Rule references are to the Tax Court rules of Practice and Procedure.↩
3. Section 6621(d) was redesignated as section 6621(c) by section 1511(c)(1)(A)-(C) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744. ↩
4. The stipulation states that "respondent does not stipulate that * * * the government securities transactions actually occurred or occurred in the manner described * * *." Therefore, our finding the facts as stipulated is not a finding that the documents are to be considered as comporting with the substance of the transactions. ↩
5. All issues involved in the case of John Maring and Rosemary Lindquist for the year 1976 have been disposed of by agreement of the parties after respondent's concession in his reply brief that John Maring and Rosemary Lindquist are not liable for the section 6653(a) addition to tax for the year 1976. ↩
6. The parties stipulated that SGS was formed in September 1980. However, the certificate of limited partnership and private placement memorandum state that SGS was formed in June 1980 and began operations in September 1980. ↩
7. The parties stipulated that Mr. Senft was the sole general partner of SGS in 1980 and 1981. This is supported by the other facts only to the extent that SFI was wholly owned and controlled by Mr. Senft and SGS, Inc. was controlled by Mr. Senft. ↩
8. Berkeley Capital initially arranged transactions with the Securities Group and New York Hanseatic Corporation in order to achieve purported tax losses of $ 12 million in 1980. Due to a rise in interest rates in the first part of December 1980, the anticipated loss of $ 12 million was reduced to approximately $ 8 million and Berkeley Capital needed a further loss. ↩
9. In July 1981, Ernest M. Grunebaum was listed as the representative of New York Hanseatic Division. The parties stipulated that if Mr. Grunebaum were called to testify, he would invoke his Fifth Amendment↩ privilege with respect to the Securities Groups and its related entities. 10. The issues disposed of by agreement of the parties include certain issues involving Beech Run's reported income and loss. ↩
11. We note that SFI's ledger sheet for Peter Maring's account lists a gain of $ 26,998.06 and a loss of $ 75,403.59, which equals a net loss of $ 48,405.53. However, SFI's summary sheet for 1979, which was sent to Peter Maring, lists a gain of $ 26,962.45 and a loss of $ 75,306.08 for a net loss of $ 48,343.63, which is the amount reported on his 1979 return. ↩
12. We note that a SFI ledger sheet lists coupon interest income of $ 85,787.03 for Peter Maring in 1981. This amount equals the amount of ordinary gain ($ 61,612) reported in 1980 plus the amount of interest income ($ 24,176) reported in 1981. The record does not indicate why Peter Maring reported the $ 61,612 as ordinary gain in 1980. ↩
13. The 1980 Schedule K-1 lists Peter Maring's distributive share of CAM's loss as $ 48,115. He reported an ordinary loss of $ 39,564 and investment expense of $ 8,551, which equals $ 48, 115. ↩
14. CAM's distributive share of SGS items were not reported on CAM's original Federal return of income for 1981, but was reported on an amended return. The amended Schedule K-1 for Peter Maring lists the following amounts: ordinary loss
(36,093)
short-term capital gain
3 long-term capital gain
16,850 political contribution credit
5 Peter Maring did not file an amended 1981 return in accordance with the amended 1981 CAM return. ↩
15. The net loss of $ 281,479 in 1979 was presumably calculated as follows: gain of $ 231,288.10 with respect to the 1978 margin deposit plus a gain of $ 284,491.92 with respect to the 1979 margin deposit, less a loss of $ 797,258.34 with respect to the 1979 margin deposit. ↩
16. SFI's summary sheet for 1975, which was sent to Dr. and Mrs. Blomquist, lists a gain of $ 65,111.65 and a loss of $ 102,774.46, which equals a net loss of $ 37,662.81. However, Dr. and Mrs. Blomquist reported a loss of $ 37,574 in 1979.↩
17. It appears that this $ 473 was deducted twice on the Blomquist's 1981 return. ↩
18. KBB's distributive share of SGS items were reported on KBB's amended, not original, Federal income tax return for 1981. The amended Schedule K-1 for Dr. and Mrs. Blomquist list the following amounts: ordinary loss
(117,815)
dividends
2 short-term capital gain
20 long-term capital gain
23,748 Political contributions credit
7 Dr. and Mrs. Blomquist did not file an amended 1981 return in accordance with the amended 1981 KBB return. ↩
19. The Schedule K-1 for Dr. McAllister lists his distributive share of KBB's loss for 1980 as $ 61,407. However, his 1980 rturn lists a loss of $ 66,090 attributable to KBB. The record does not indicate how Dr. McAllister determined the additional loss of $ 4,683. ↩
20. An amended 1981 Schedule K-1 of KBB for Dr. McAllister lists the following amounts: ordinary loss
($ 142,049)
dividends
3 short-term capital gain
27 long-term capital gain
21,505 political contribution credit
6 Dr. McAllister did not amend his 1981 return in accordance with the amended KBB Schedule K-1. ↩
21. The client sheet of Senft & Co. indicates that Mr. Castagno realized a loss of $ 27,409.31 in 1978. The record does not explain why Mr. Castagno reported a loss of $ 25,548.20, instead of $ 27,409.31. ↩
22. In 1979 Mr. Castagno realized a purported gain of $ 28,776.66 and a loss of $ 58,368.06 with respect to the margin deposits of 1978 and 1979, respectively. Thus, Mr. Castagno purportedly sustained a net loss of $ 29,591.40 in 1979 with respect to the purported government securities transactions. ↩
23. The loss of $ 2,187.50 from the purported government securities transactions was offset by gain of $ 290, which resulted from Mr. Castagno's investment in CAM. Thus, the net short-term capital loss reported on the return was $ 1,898.↩
24. The record indicates that Mr. Castagno was the managing partner of CAM in 1980. However, the record is unclear whether he was the managing partner of CAM in 1981. ↩
25. An amended 1981 Schedule K-1 of CAM for Mr. Castagno lists the following amounts: ordinary loss
(52,198)
dividends
1 short-term capital gain
9 long-term capital gain
9,736 Political contribution credit
3 Mr. Castagno did not amend his 1981 return in accordance with the amended CAM Schedule K-1.↩
26. In a Stipulation of Agreed Adjustments, which was filed with this Court on January 20, 1987, the parties agreed that John Maring is not entitled to his distributive share of Beech Run losses in 1977 and 1979 to the extent such losses are attributable to the deduction of advanced minimum royalties of $ 520,000 in 1977 and $ 260,000 in 1979 or the deduction of any interest attributable to the advanced minimum royalty notes. The parties also agreed that John Maring was entitled to deduct his distributive share of Beech Run losses attributable to coal mining activities, i.e., $ 378, $ 738, and $ 830 in 1977, 1978, and 1979, respectively. ↩
27. Section 108 of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, read, in part, as follows: (a) General Rule. -- For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions -- (1) which were entered into before 1982 and form part of a straddle, and (2) to which the amendments made by title V of Economic Recovery Tax Act of 1981 do not apply,
any loss from such disposition shall be allowed for the taxable year of the disposition if such position is part of a trasaction entered into for profit. Section 1808(d)1) of the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085, 2817, amended section 108(a) by striking "if such position is part of a transaction entered into for profit" and inserting in lieu thereof "if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business." Section 108 of the Tax Reform Act of 1984, as amended by the Tax Reform Act of 1986, applies to the dispositions of straddle positions that were entered into before June 23, 1981, which is the effective date of sections 501-509 of the Economic Recovery Tax Act (ERTA) of 1981, Pub. L. 97-34, 95 Stat. 172, 323-338. Sections 501-509 of ERTA eliminated certain favorable tax consequences of straddle transactions. Boswell v. Commissioner,91 T.C. 151, 157 n.5 (1988). According to section 1092, which was added to the Code by section 501 of ERTA, losses relating to straddle transactions are not deductible except to the extent that such losses exceed unrealized gains on offsetting straddle positions. Boswell v. Commissioner, supra at 157 n.5; Fox v. Commissioner,82 T.C. 1001, 1017↩ (1984). Section 505 of ERTA repealed section 1221(5), which specifically excluded Treasury bills from the definition of a capital asset, and subjected short-term government obligation to new section 1232(a)(4). Additionally, section 502 of ERTA added section 263(g), which provides that interest and carrying charges allocable to personal property that is part of a straddle must be capitalized. According to section 508(a), the amendments made by ERTA apply to straddle positions established after June 23, 1981. 28. Wehrly v. United States,808 F.2d 1311 (9th Cir. 1986), is in conflict with Miller v. Commissioner,836 F.2d 1274 (10th Cir. 1988), revg. 84 T.C. 827 (1985). In Landreth v. Commissioner,845 F.2d 828 (9th Cir. 1988), affg. a Memorandum Opinion of this Court, the Ninth Circuit panel stated that it agreed with the Tenth Circuit's Miller decision and the dissenting opinion in Wehrly but concluded that it was "bound to follow Wehrly as the law of this circuit." In Boswell v Commissioner,91 T.C. 151 (1988), this Court adopted the position taken by the Tenth Circuit in Miller.In Ewing v. Commissioner,↩ 91 T.C.    (August 30, 1988), a case appealable to the Ninth Circuit, we reiterated that the phrase "transaction entered into for profit" as used in amended sec. 108 is to be interpreted by reference to the subjective or primary purposes standard. An appeal in these cases would lie in the Ninth Circuit. 29. Petitioners argue that it would be a lack of due process to conclude that they had failed to show actual trades through ACLI since the Court denied their motion to enforce certain subpoenas. The record is sufficient to support an affirmative finding that there were no actual purchases and sales through ACLI. Also, the Court did enforce the subpoenas at the trial, but merely refused a further hearing. On January 6, 1987, a subpoena was served upon Kleinwort Benson North America Corporation, successor to ACLI, at the request of petitioners. The subpoena ordered an authorized and knowledgeable representative of Kleinwort to appear at the Tax Court hearing on January 20, 1987 at 10 a.m. and to bring -- any and all originals of trade slips, trading tickets, customer trading sheets, stock records, daily trade blotters, confirmations, customer statements, summaries, worksheets, corresponding trade data, memoranda, telephone call slips, magnetic data tapes, voice tapes, and video tapes, and any other item or thing memoralizing in any manner the transactions with your company and the above named petitioners.
Some of the subpoenaed documents were provided and submitted into the record as petitioners' exhibits. On January 16, 1987, a subpoena was served upon Arthur Young & Company at the request of petitioners. The subpoena ordered an authorized and knowledgeable representative of Arthur Young to appear at the Tax court hearing on January 20, 1987, and to bring -- any and all accountants working papers used and generated in preparation of financial statements and Federal income tax return for fiscal year 1981 or calendar year 1981 for "The securities Group 1980." Financial statements consist of balance sheet, statement of income, statement of changes in partners capital, statement of changes in financial position.
On January 22, 1987, pursuant to petitioner's motion, the Court ordered Arthur Young to comply with the subpoena during the Tax Court trial in January 1987. The Court also ordered Arthur Young to deliver to petitioners' counsel on or before January 26, 1987, copies of documents in the possession of Arthur Young in accordance with the request in the subpoena. Arthur Young provided some of the subpoenaed documents to petitioners' counsel on or before January 26, 1987. On January 28, 1987, at the close of the Tax Court trial, the Court left the record open for 30 days, i.e., February 27, 1987, in order to allow petitioners to obtain additional evidence under the subpoena served upon Arthur Young, as well as the subpoena served upon Kleinworth on January 6, 1987. On February 26, 1987, petitioners filed a motion entitled "Motion for 31 Additional Days to Obtain Evidence" with respect to the subpoenas served upon Arthur Young and Kleinworth. The Court granted petitioners' motion to hold open the record until March 31, 1987. On March 16, 1987, petitioners filed motions requesting enforcement of the January 6, 1987 subpoena served upon Kleinworth and a subpoena which they had served upon Arthur Young & Company on March 3, 1988. In conjunction with the two motions with respect to the subpoenas, petitioners filed a motion for second extension of time to obtain evidence. These motions also requested that the Court set the case for further trial in Washington, D.C. to receive testimony from a representative of Kleinworth and Arthur Young. On March 20, 1986, the Court denied all three of the motions. In an order dated April 7, 1986, the Court ordered the record in the instant case closed. At the conclusion of the trial, the Court had clearly advised petitioner that it was their responsibility to produce the documents the record was held open to receive. It was at petitioner's request that the record was held open. ↩
30. As we have found some small amount of actual trades were made by Mr. Canton for SFI but the record fails to show to which clients these trades were distributed. The amount of such trades was too insignificant to affect the overall operations of SFI. ↩
31. SGS may have had some legitimate business operations. However, clearly its primary if not exclusive function with respect to its purported Treasury securities was the generating of fictitious tax losses. ↩
32. In support of their argument that their losses were deductible under section 108, petitioners presented the testimony and report of John D. Settle, Ph.D., an assistant professor in the School of Business Administration of Portland State University. After reviewing some, but not all, of the documents concerning petitioners' purported government securities transactions, Dr. Settle concluded that there was a reasonable expectation of profit from the transactions. We find that the report and testimony of petitioners' expert witness is not relevant to the instant case. The controlling issue in the instant case is whether petitioners' purported government security transactions are bona fide. Dr. Settle's report and testimony address the issue of whether transactions in government securities which were bona fide might reasonably be expected to result in profit, not whether the transactions in issue actually occurred. In fact, Dr. Settle admitted that he did not know enough about the transactions in issue to know whether they were legitimate.↩
33. Section 212 reads as follows: SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year -- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax.↩
34. Prior to amendment by section 722(b)(1) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 342, section 6653(a) read as follows: (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income, Gift, or Windfall Profit Taxes. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B (relating to income taxes and gift taxes), or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. Section 6653(a), as amended by the Economic Recovery Tax Act of 1981 and section 107(a)(3) of the Technical Corrections Act of 1982, Pub. L. 97-448, 96 Stat. 2365, 2391, read as follows: (a) Negligence Or Intentional Disregard of Rules and Regulations with Respect to Income, Gift, or Windfall Profit Taxes. -- (1) In general. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules or regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. (2) Additional amount for portion attributable to negligence, etc. -- There shall be added to the tax (in addition to the amount determined under Paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to the negligence or intentional disregard referred to in paragraph (1), and (B) for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax). ↩
35. Section 6621(c)(3)(A), as amended by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2740, reads as follows: (3) Tax Motivated Transactions. -- (A) In General. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659 (c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distribution of income for any period, and (v) any sham or fraudulent transaction. ↩
36. Section 6673 was amended by section 1552(a) of the Tax Reform Act of 1986, Pub. L.99-514, 100 Stat. 2085, 2753. Section 6673, unamended by the Tax Reform Act of 1986, is applicable to the instant case. ↩